1
2
3
4
5

John J. McLeod, Esq., CA Bar No. 174169
Kristina A. Fretwell, Esq., CA Bar No. 297624
McLEOD LAW GROUP, A.P.C.
701 B Street, Suite 1570
San Diego, California 92101
Telephone:  (619) 236-9938
Facsimile:  (619) 236-9943
Email: jmcleod@mcleodlawgroup.com
Email: kfretwell@mcleodlawgroup.com

6
7

Attorneys for Defendant/Counter-Claimants,
RENO CONTRACTING, INC., COYLE/RENO II,
and COYLE RESIDENTIAL, INC.

8
9
10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12 PHILADELPHIA INDEMNITY<br>INSURANCE COMPANY,<br>13<br> Plaintiff,<br>14<br>v.<br>15<br>TL FAB, LP, a limited partnership;<br>16 RENO CONTRACTING, a California<br>Corporation; and DOES 1 to 25, inclusive<br>17<br> Defendants.<br>18 ──────────────────────<br>19 RENO CONTRACTING, INC., a<br>California Corporation; COYLE/RENO II,<br>20 a California Joint Venture; and COYLE<br>RESIDENTIAL, INC., a California<br>21 Corporation,<br>22<br> Counter-Claimants,<br>23<br>v.<br>24<br>PHILADELPHIA INDEMNITY<br>25 INSURANCE COMPANY; and ROES 1<br>26 to 100 inclusive.<br>27<br> Counter-Defendants.<br>28 | CASE NO. 3:17-cv-00306-W-MDD<br><br>**COUNTER-CLAIMANTS'<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF<br>THEIR OPPOSITION TO<br>PHILADELPHIA INDEMNITY<br>INSURANCE COMPANY'S MOTION<br>FOR SUMMARY JUDGMENT, OR<br>IN THE ALTERNATIVE MOTION<br>FOR PARTIAL SUMMARY<br>JUDGMENT**<br><br>Filed concurrently with:<br> 1.  Responsive Separate Statement of<br>  Undisputed Material Facts;<br> 2.  Declaration of Peter Hunter;<br> 3.  Declaration of David A. Ball; and<br> 4.  Declaration of Kristina A. Fretwell.<br><br>Date:      April 24, 2018<br>Time:      10:00 a.m.<br>Location:  Chambers of Magistrate Judge<br>           Mitchell D. Dembin<br>           333 West Broadway<br>           Suite 1180<br>           San Diego, CA 92101 |

# TABLE OF CONTENTS

I.   RENO'S REASONS FOR OPPOSING PHILADELPHIA'S POSITION ...............1

II.  INTRODUCTION ....................................................................................2

III. STATEMENT OF FACTS .........................................................................5

   A.   Coverage Issues ...............................................................................6

   B.   Philadelphia's Retaliatory Conduct...................................................7

   C.   Philadelphia's Improper Discovery ..................................................7

IV.  ARGUMENT ............................................................................................8

   A.   Summary Judgment Standard ...........................................................8

   B.   Applicable Law ................................................................................8

   C.   Philadelphia Must Prove that Reno's Loss Was Proximately Caused by an
   Excluded Peril ..........................................................................................8

   D.   Efficient Proximate Cause Analysis .................................................9

   E.   The Faulty Workmanship Exclusion Does Not Bar Coverage for Reno's Loss 11

      1.   Coverage is Available for Damages Resulting from Inadequate Drainage in
      the Parking Structure for Building A ......................................................16

   F.   Philadelphia's Reliance on the Rain Exclusion Is Misplaced............18

   G.   Philadelphia is Liable for Bad Faith.................................................20

      1.   Philadelphia's Denial of Reno's Claim Was Not Reasonable........................20

      2.   Philadelphia's Bad Faith Conduct ....................................................22

   H.   Punitive Damages...........................................................................24

V.   CONCLUSION ......................................................................................25

1

## TABLE OF AUTHORITIES

2

**Federal Cases**

3

*Allstate Ins. Co. v. Smith*, 929 F.2d 447 (9th Cir. 1991) ..........................................passim

4

*Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152 (9th Cir. 2001)........................20

5

*Ambat v. City & County of San Francisco*, 757 F.3d 1017 (9th Cir. 2014) ....................8

6

7

*Berman v. Amex Assur. Co.*, 2008 U.S. Dist. LEXIS 127228 (C.D. Cal. Nov. 14, 2008) ................................................................................................................................14

8

*Berman v. Amex Assur. Co.*, 2011 U.S. Dist. LEXIS 23716 (C.D. Cal. Feb. 22, 2011) 14

9

*Bernstein v. Travelers Ins. Co.*, 447 F.Supp.2d 1100 (N.D. Cal. 2006)........................22

10

*Century Theaters, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2006 U.S. Dist. LEXIS

11

15766 (N.D. Cal. 2006)........................................................................................passim

12

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ..................................................8

13

*James McHugh Constr. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 F.Supp.3d 462

14

(2016) ........................................................................................................................14, 22

15

*M.A. Mortenso Co. v. Indem. Ins. Co. of N. Am.*, 1999 U.S. Dist. LEXIS 22641 (D.

16

Minn. Dec. 23, 1999) ..........................................................................................15

17

*Pettinaro Constr. Co. v. Utica Mut. Ins. Co.*, 2001 U.S. Dist. LEXIS 9044 (D. Del.

18

March 30, 2001) ....................................................................................................15

19

*Schaber v. Allstate Ins. Co.*, 2007 U.S. Dist. LEXIS 92942 (C.D. Cal. Dec. 18, 2007) 14

20

**State Cases**

21

*Acme Galvanizing Co., Inc. v. Fireman's Fund Ins. Co.*, 221 Cal.App.3d 1070 (1990)19

22

*AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807 (1990)..................................................12

23

*Alex R. Thomas & Co. v. Mut. Serv. Casualty Ins. Co.*, 98 Cal.App.4th 66 (2002).......10

24

*Austero v. National Cas. Co. of Detroit, Mich.*, 84 Cal.App.3d 1 (1978).....................22

25

*Aydin Corp. v. First State Ins. Co.*, 18 Cal.4th 1183 (1998) ...........................................9

26

*Century Sur. Co. v. Polisso*, 139 Cal.App.4th 922 (2006) ............................................20

27

*Diep v. California Fair Plan Ass'n.*, 15 Cal.App.4th 1205 (1993) ................................20

28

*Filippo Indus., Inc. v. Sun Ins. Co.*, 74 Cal.App.4th 1429 (1999) ................................. 21

*Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395 (1989) ....................... 9, 10, 11, 18

*Griffen Dewatering Corp. v. Northern Ins. Co. of N.Y.*, 176 Cal.App.4th 172 (2009) .. 21

*Julian v. Hartford Underwriters Ins. Co.*, 35 Cal.4th 747 (2005) .......................... passim

*Mirpad, LLC v. California Ins. Guarantee Assn.*, 132 Cal.App.4th 1058 (2005) .......... 14

*Morris v. Paul Revere Life Ins. Co.*, 109 Cal.App.4th 966 (2003) ................................ 20

*National Union Fire Ins. Co. v. Lynette C.*, 228 Cal.App.3d 1073 (1991) ..................... 9

*Sabella v. Wisler*, 59 Cal.2d 21 (1963) ......................................................................... 10

*Safeco Ins. Co. of America v. Robert S.*, 26 Cal.4th 758 (2001) ..................................... 9

*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal.App.4th 847
    (2000) .......................................................................................................................... 22

*Silberg v. Calif. Life Ins. Co.*, 11 Cal.3d 452 (1974) .................................................... 24

*St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.*, 65 Cal.App.3d
    66 (1976) ................................................................................................................. 7, 23

*State Farm Mut. Auto Ins. Co. v. Partridge*, 10 Cal.3d 94 (1973) ................................ 12

*State of Calif. v. Allstate Ins. Co.*, 45 Cal.4th 1008 (2009) ......................................... 17

*Strubble v. United States Auto Ass'n.*, 35 Cal.App.3d 498 (1973) .................................. 9

*Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269 (1994) ............................... 22

*Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1 (1995) .............................................. 9

*White v. Western Title Ins. Co.*, 40 Cal.3d 870 (1995) .................................................. 24

*Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713 (2007) ............................................... 22

**Federal Statutes**

Fed. R. Civ. P. 56(a) ........................................................................................................ 8

**State Statutes**

Cal. Civ. Code § 3294 ..................................................................................................... 24

Cal. Civ. Code § 3294(a) ................................................................................................ 24

Cal. Civ. Code § 3294(b) ................................................................................................ 25

**Local Court Rules**

CivLR 7.1.f.1 ................................................................................................. 5

**California Rules of Court**

Cal. Rules of Court, Rule 3.1350(d)(3) ........................................................... 5

Counter-Claimants Reno Contracting, Inc., Coyle/Reno II and Coyle Residential, Inc. (collectively "Cross-Claimants" or "Reno") respectfully submit the following Memorandum of Points and Authorities in Support of their Opposition to Philadelphia Indemnity Insurance Company's ("Philadelphia") Motion for Summary Judgment or in the Alternative Motion for Partial Summary Judgment ("Motion").

## I.     RENO'S REASONS FOR OPPOSING PHILADELPHIA'S POSITION

Reno opposes Philadelphia's Motion for the following reasons.  The 9th Circuit's decision in *Allstate Ins. Co. v. Smith*, 929 F.2d 447 (9th Cir. 1991) (applying California law) is controlling.  Philadelphia expressly admitted that the efficient proximate cause of the loss was Reno's "inadequate provision and maintenance of temporary protection measures."  Such does not constitute "faulty workmanship" under the terms of the policy, because the project was not yet finished at the time of the loss.  Moreover, the "rain exclusion" does not apply.  Philadelphia's own expert consultant expressly found that the weather event did not cause Reno's loss.  Nor does the design exclusion apply as Reno was aware of the elimination of the trench drain and the pooling of water on the top level of the garage deck prior to the loss.  Reno tried to protect the building from these known conditions; but, its efforts were insufficient.  Finally, Philadelphia engaged in a pattern and practice of bad faith since inception of the claim.  Philadelphia (a) refused to follow California law; (b) refused to reconsider its declination of coverage; (c) filed a retaliatory subrogation action against Reno, its own insured, for unrelated losses arising out of the Project after Reno advised Philadelphia that Reno intended to sue Philadelphia for this loss; (d) improperly scheduled EUOs after it denied coverage and unreasonably gave Reno less than 24 hours' notice of the same; and (e) accused Reno of insurance fraud notwithstanding testimony directly contrary to Philadelphia's claims.  Philadelphia's actions in denying coverage were not reasonable and are not excused by the genuine dispute doctrine.  They also represent a careless disregard for the rights of its insured and an obstinate persistence in an ill-advised position.  Such constitutes oppression, subjecting Philadelphia to punitive damages.

## II.   INTRODUCTION

Through its Motion, Philadelphia attempts to escape liability for its bad faith denial of Reno's claim.  Philadelphia's Motion is replete with misstatements of law.  What is more, Philadelphia expressly refused to follow California law, instead relying almost exclusively on out-of-state cases to support its erroneous coverage determination.  Such is especially egregious given that Philadelphia sold the policy to a California insured for the construction of a San Diego project.  There is no evidence that Philadelphia notified its insureds that Philadelphia would refuse to follow California law on the "faulty workmanship" exclusion, a key component of the Builder's Risk policy at issue here.

In December 2014, during a storm that brought with it high winds and record-breaking rain, measures installed by Reno, the general contractor for the West Park at Civita Apartments (the "Project"), to protect the partially-constructed buildings from the inclement weather were damaged and/or blown off the buildings entirely.  As a result, water entered both buildings through the following general areas.  In Building A, visqueen was blown off the building and, as a result, water entered through the windows and doors, in addition to the incomplete roof assemblies.  In addition, water entered Building A from the central garage at the fifth-floor entry vestibule as the measures intended by Reno to keep water from entering the vestibule were insufficient.  In Building B, water entered through the incomplete 3-hour fire rated wall assemblies which were not sufficiently protected from the weather.  Upon receiving notice of the loss, Philadelphia retained Madsen, Kneppers & Associates, Inc. ("MKA") to inspect the property.  MKA concluded that the damage was caused, in large part, by Reno's alleged failure to protect the exposed buildings.

Reno did not dispute MKA's conclusion that Reno failed to adequately protect the buildings.  And, in fact, it is undisputed that water entered Building A through the open windows and doors and incomplete roof assemblies and Building B through the incomplete 3-hour fire rated wall assemblies due to Reno's "inadequate provision and maintenance of temporary protection measures."  Reno disputes, however, MKA's

conclusion that the water that entered Building A from the fifth-floor entry vestibule as a result of design errors in the garage.  Rather, Reno knew about these conditions and implemented measures to protect the building in light of those known conditions, but those efforts proved insufficient.

Philadelphia denied Reno's claim, relying almost exclusively on the "faulty workmanship" exclusion, claiming that Reno's "inadequate provision and maintenance of temporary protection measures" constituted faulty workmanship under the policy.

Rather curiously, approximately six months prior to the December storm, a welding subcontractor allegedly ignited some stucco paper near the wood framing of an exterior wall.  Even though the loss arose out of the faulty work of the welding subcontractor, T.L. Fab, LP, Philadelphia paid $86,774 to reimburse the project owner, QF Westpark, LLC ("QFW"), for the loss.  Philadelphia did not invoke the "faulty workmanship" exclusion.  Philadelphia's acknowledgment of coverage for the fire loss, but not the water loss, even though both were caused by faulty work, demonstrates Philadelphia's selective application of the faulty workmanship exclusion.  It can be inferred that Philadelphia paid the approximately $86,000 fire loss, but denied Reno's claim for $491,128, because the total would have exceeded the $508,847 in premiums charged by Philadelphia for the policy.

Reno disputed the denial, notifying Philadelphia that its reliance on the "faulty workmanship" exclusion was misplaced as the exclusion applied only to the flawed quality of a finished product, not a flawed process (i.e. to damages arising out of the course of the work).  *Allstate, supra*, 929 F.2d 447.  However, Philadelphia refused to reconsider its coverage determination, declined to follow California law and relied on out-of-state cases allegedly criticizing the 9th Circuit's decision in *Allstate*.

True to form, Philadelphia relies on a number of out-of-state cases in this Motion.  Moreover, Philadelphia blatantly misstates the law, asserting that *Allstate* has been superseded by the California Supreme Court's decision in *Julian v. Hartford Underwriters Ins. Co.*, 35 Cal.4th 747 (2005).  However, *Julian* does not expressly or

inferentially overrule *Allstate*—it does not even discuss the decision.  Nor does it even address the "faulty workmanship" exclusion.  What is more, while Philadelphia claims that California case law has evolved and departed from *Allstate*, Philadelphia cites no California decision to that effect.  Instead, Philadelphia ignores the several cases adopting the *Allstate* decision, including *Century Theaters, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2006 U.S. Dist. LEXIS 15766 (N.D. Cal. 2006) (applying California law).

Philadelphia's Motion demonstrates the level of bad faith with which they have operated from the start.  Philadelphia has done nothing more than attempt to end-run coverage at every turn.  For instance, the "faulty workmanship" exclusion was not the first exclusion Philadelphia relied on in denying coverage to Reno.  Philadelphia initially asserted that the "rain exclusion" barred coverage for Reno's losses.  However, MKA (Philadelphia's own expert) reported that "[w]e did not observe any indication that the conditions causing the water to intrude into Building A was caused and/or damaged by the weather events that occurred on December 2nd, 3rd and 4th of 2014."  MKA reached the same conclusion for Building B.  Philadelphia was thus hard pressed to argue that the efficient proximate cause of Reno's loss was the rain.  Philadelphia abandoned its reliance on the "rain exclusion" after Reno contested Philadelphia's denial.  In fact, Philadelphia expressly adopted MKA's conclusion that the "inadequate provision and maintenance of temporary protection measures" was the efficient proximate cause of the loss in its subsequent letters reaffirming its denial of coverage.  Notwithstanding the same, in this Motion, Philadelphia once again asserts that there are multiple "proximate causes" for Reno's loss, including the rain.  Philadelphia's constantly changing position is further evidence of its bad faith claims handling.

In addition, after Reno had threatened to file suit, Philadelphia retaliated, filing suit against Reno, its own insured, for reimbursement of funds paid to QFW for the prior fire loss.  Of course, it is well settled that an insurer cannot subrogate against its own insured.  Yet, not only did Philadelphia sue Reno, it ignored its insured's demands that the case be dismissed.  As a result, Reno was forced to respond to Philadelphia's complaint and file

its compulsory cross-complaint.  Philadelphia eventually agreed to dismiss its complaint, however, not before it asked Reno to dismiss its cross-complaint and waive costs.  Reno refused.  After Philadelphia finally dismissed its complaint, Philadelphia removed this matter to federal court, even though Philadelphia initially filed suit in state court.

As if the above were not enough, notwithstanding its refusal to withdraw its denial of coverage, Philadelphia asked Reno to arrange Examinations Under Oath of QFW under the guise of a "continued investigation."  Reno repeatedly requested that Philadelphia provide authority for taking an EUO after denying a claim.  Philadelphia was unable to do so.  And in fact, Reno provided Philadelphia with authority supporting the opposite—Philadelphia waived its right to conduct EUOs when it denied coverage.  Philadelphia then scheduled the EUOs itself.  What is more, Philadelphia provided Reno with less than 24 hours' notice of the EUOs.  Philadelphia then conducted the EUOs in violation of the Federal Rules of Civil Procedure (as the Rule 26(f) conference had not yet taken place) and over Reno's objections.

Philadelphia cannot escape liability for its bad faith behavior.  Given the same, this Court should deny Philadelphia's Motion in its entirety.

## III.   STATEMENT OF FACTS

Reno was the general contractor for the West Park at Civita Apartments, a 612-unit apartment complex comprised of two buildings (Buildings A and B), each with five floors and a central parking garage, located in San Diego, California.  (Responsive Separate Statement of Undisputed Material Facts ("RSS") ¶1, 2, 130.)[1]

On or about December 2-4, 2014, during construction of the Project, a powerful storm moved through southern California, bringing with it high winds and record-breaking rain ("December weather event").  (RSS ¶ 133.)  At such time, Building A was approximately 70% finished, while Building B was approximately 40% complete.  (RSS

---

[1] The Southern District of California Local Rules provide that "[w]here appropriate, a separate statement of undisputed material facts must be provided."  CivLR 7.1.f.1.   The rule does not, however, specify a format for the separate statement.  As a result, Reno prepared its Responsive Separate Statement in the format required by Cal. Rules of Court, Rule 3.1350(d)(3).  Note that Philadelphia did not follow the same format.

COUNTER-CLAIMANTS' P&As ISO THEIR OPPOSITION TO PHILADELPHIA'S MSJ

¶ 134).  In an effort to protect the exposed buildings, among other things, Reno installed protective visqueen over the open windows and doors.  (RSS ¶ 135.)  During the storm, the visqueen, along with the protective measures installed at the then-top-layer of Building B, was damaged and, in some cases, blew entirely off the building.  (RSS ¶ 136.)  As a result, water entered Building A through the open windows and doors and the incomplete roof assemblies.  (RSS ¶ 19.)  In addition, water was able to enter Building A from the parking garage.  *Id.*  In Building B, water flowed down the incomplete 3-hour fire rated wall assemblies, collecting briefly at the base of each intervening floor level where it flowed horizontally until encountering the gap between the non-combustible cement fiber board and floor sheathing and continued its path downward, causing damage to the gypsum wall board shaft liner and mineral fiber insulation throughout the building.  (See RSS ¶ 140.)

## A. Coverage Issues

The Project was built under a Builders Risk policy (the "Policy") issued by Philadelphia.  (RSS ¶ 3.)  Reno was an additional named insured under the Policy.  *Id.*

On or about December 9, 2014, five days after the storm, QFW provided notice to Philadelphia, on Reno's behalf, of the damages.  (RSS ¶ 137.)  The notice included a description of the property involved, as well as how, when and where the damage occurred.  *Id.*  Thereafter, and as required by the Policy, Reno undertook necessary repairs to prevent any further damage to the Project.  (RSS ¶ 138.)  Reno paid $491,128, which amount was not reimbursed by QFW.  (RSS ¶ 139.)

Philadelphia retained MKA to investigate the claimed damages.  (RSS ¶ 9.)  MKA issued two reports, dated June 25, 2015 (Building A) and August 14, 2015 (Building B), in which MKA concluded the causes of loss to Building A were the improper design of the garage drainage system, deficient construction, and the inadequate securing and protection of the work against the elements, and that, in Building B, "the primary cause of water intrusion was the inadequate provision and maintenance of temporary protection measures on the incomplete 3-hour fire rated wall assemblies."  (RSS ¶ 140.)

Following MKA's investigation, on or about September 1, 2015, Philadelphia denied Reno's claim.  In its denial, Philadelphia alleged that "the policy does not afford coverage for Water; Rain unless the building first sustains damage from a covered cause of loss to its roofs or walls; deficient design or faulty workmanship."  (RSS ¶¶ 42, 43.)

Reno disputed Philadelphia's coverage position by letters dated March 16 and June 14, 2016.  (RSS ¶¶ 141, 143.)  In response to both, Philadelphia reaffirmed its denial and refused to reopen its investigation.  (RSS ¶¶ 142, 144.) On November 28, 2016, Reno made a third and final demand that Philadelphia withdraw its denial of coverage or face litigation.  (RSS ¶ 146.)

## B. Philadelphia's Retaliatory Conduct

On or about December 1, 2016, Philadelphia filed the instant action against Reno, among others, for reimbursement of sums paid to QFW for the prior fire loss caused by Reno's welding subcontractor.  (RSS ¶ 147.)  Reno demanded that Philadelphia immediately dismiss its complaint, as it improperly sought subrogation from its own insured.  (RSS ¶ 148.) *St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.*, 65 Cal.App.3d 66, 75 (1976).  Philadelphia ignored Reno's demand, forcing Reno to respond, including filing its compulsory cross-complaint for bad faith.  (RSS ¶ 149.)

On February 7, 2017, Philadelphia finally dismissed its complaint, with prejudice, leaving only Reno's cross-complaint.  (RSS ¶ 150.)  Subsequently, Philadelphia removed Reno's cross-complaint to federal court.  (RSS ¶ 151.)

## C. Philadelphia's Improper Discovery

In January 2017, Philadelphia asked Reno to arrange for Examinations Under Oath ("EUO") of Marco Sessa and Matt Adams, both with QFW.  (RSS ¶ 152.)  Reno asked on what legal authority Philadelphia was entitled to conduct the EUOs, given its coverage denial.  (RSS ¶ 153.)  Philadelphia acknowledged it did not have any.  *Id.*  In fact, Philadelphia was not legally entitled to these EUOs.  14 *Couch on Insurance* 2d § 49A:363 (1982).  Also, personal knowledge of the relevant facts rested with Reno, not QFW.  Yet, Philadelphia persisted.

On March 30, 2017, at about 10:00 a.m., Philadelphia notified Reno that it had scheduled the EUOs of Mr. Sessa and Mr. Adams for 9:30 a.m. the following day (March 31). (RSS ¶ 154.) Reno objected, because, among other reasons, Philadelphia was not permitted to obtain any discovery prior to the Rule 26(f) conference and Philadelphia gave less than 24 hours' notice to Reno, which was unreasonable. (RSS ¶ 155.) Philadelphia refused to cancel the EUOs and went forward with them, claiming they were necessary to further Philadelphia's "investigation" of Reno's claim—a claim which Philadelphia denied in September 2015. (RSS ¶ 156.) (And, in fact, in its September 2015 denial, Philadelphia specifically indicated that "we have competed our investigation into the captioned claims." To date, Philadelphia has refused to withdraw its declination of coverage.

## IV.   ARGUMENT

### A. Summary Judgment Standard

To prevail on its Motion, Philadelphia must show that there is "no genuine dispute as to any material fact and [Philadelphia] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because summary judgment is a drastic device, cutting off a party's right to present its case to the jury, the moving party bears a heavy burden of demonstrating the absence of any triable issues of material fact." *Ambat v. City & County of San Francisco*, 757 F.3d 1017, 1013 (9th Cir. 2014). To prevail, Philadelphia must identify those issues on which Reno allegedly cannot meet its burden of proof at trial.

### B. Applicable Law

Federal courts exercising diversity jurisdiction must apply the substantive law of the state in which they are located except on matters governed by the U.S. Constitution or federal statute. Procedural issues, on the other hand, are governed by federal law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This action is one sounding in diversity, thus, the Court must apply the substantive law of California.

### C. Philadelphia Must Prove that Reno's Loss Was Proximately Caused by an Excluded Peril

1    Philadelphia incorrectly asserts that Reno must specifically establish that its claim
2    is covered under the policy.   Generally, the burden is initially on the insured to
3    demonstrate that the loss is within the policy's insuring clause.   The burden then shifts
4    to the insurer to come forth with proof that an exclusion applies.   *Waller v. Truck Ins.*
5    *Exchange, Inc.*, 11 Cal.4th 1, 16 (1995).   However, that is not true in an action on an all
6    risk policy, such as the one here.   An all risk policy covers *all risks* save those specifically
7    excluded.   As a result, the insured need only establish that a loss occurred.   *Strubble v.*
8    *United States Auto Ass'n.*, 35 Cal.App.3d 498, 504 (1973).   The insurer, on the other
9    hand, must prove that the insured's loss was proximately caused by a peril specifically
10   excluded by the policy.   *Id.   See also Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d
11   395, 406 (1989) (under an all risk policy, the insured has the threshold burden of proving
12   a loss within the policy's insuring clause while the insured must prove the loss was
13   caused by an excluded peril).   Thus, Reno need only prove that a loss occurred, a fact
14   that is not disputed.   Philadelphia must establish that the loss is excluded by the terms of
15   the policy.

16   If Philadelphia can carry its burden, then Reno bears the burden of proving an
17   exception to an exclusion applies.   *Aydin Corp. v. First State Ins. Co.*, 18 Cal.4th 1183,
18   1193 (1998).   While exclusions limit or take away coverage provided by the insuring
19   clause, exceptions give back coverage taken away by the exclusion.   *National Union Fire*
20   *Ins. Co. v. Lynette C.*, 228 Cal.App.3d 1073, 1082 (1991).   By and large, exclusions are
21   interpreted strictly so that any ambiguities will be resolved against the insurer.   *Safeco*
22   *Ins. Co. of America v. Robert S.*, 26 Cal.4th 758, 765-66 (2001).   Exceptions to exclusions
23   are "somewhat analogous to coverage provisions" and are interpreted broadly in favor of
24   coverage.   *National Union, supra*, 228 Cal.App.3d at 1082.

25   **D. Efficient Proximate Cause Analysis**

26   Rather incredulously, and contrary to the law cited in its own brief, Philadelphia
27   argues that there are multiple proximate causes of Reno's loss, including "Reno's failure
28   to properly cover the roof upon anticipation of rain, and then the rain itself." (Motion, p.

15, ¶¶ 4-6.)  As such, Philadelphia relies on both the "faulty workmanship" exclusion and the "rain exclusion" in supporting its denial of Reno's claim.

As acknowledged by Philadelphia in its own Motion, the efficient proximate cause of a loss is the predominate or most important cause of a loss.  *Julian, supra*, 35 Cal.4th at 753; *Alex R. Thomas & Co. v. Mut. Serv. Casualty Ins. Co.*, 98 Cal.App.4th 66, 72 (2002); *Garvey, supra*, 48 Cal.3d at 403.  If the predominate cause is covered, the loss is covered, regardless of whether the efficient proximate cause is the triggering cause of the loss.  *Garvey, supra*, 48 Cal.3d at 403.  *See also Sabella v. Wisler*, 59 Cal.2d 21, 31-32 (1963) ("in determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause – the one that sets the others in motion – is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster").  In California, the efficient proximate cause doctrine is "the preferred method for resolving first party insurance disputes involving losses caused by multiple risks or perils, at least one of which is covered by insurance and one of which is not."  *Julian, supra*, 35 Cal.4th at 753. Where there is a concurrence of different causes, such as here, a proximate cause analysis establishes the predominate or most important cause.  *E.g.*, *Alex R. Thomas & Co, supra*, 98 Cal.App.4th at 72.

As described above, in its report, MKA concluded that the "inadequate provision and maintenance of temporary protection measures" was, in large part, what caused the damages sustained during the December weather event.  (*See* RSS ¶ 140.)  Importantly, the report expressly stated that "[w]e did not observe any indication that the conditions causing the water to intrude into Building A was caused and/or damaged by the weather event/s that occurred on December 2nd, 3rd and 4th of 2014."  (RSS ¶ 157.)  Philadelphia adopted this conclusion in its own letters reaffirming its denial of coverage.  For instance, in its March 29, 2016 letter, Philadelphia admitted that the "efficient proximate cause" of the damage was, in most cases, "the inadequate provision and maintenance of temporary protection measures."  (RSS ¶ 142.)  While the rain may have been the

1    immediate cause of the loss, that is not controlling. *Garvey, supra*, 48 Cal.3d at 403. As

2    Philadelphia admits, Reno's alleged failure to adequately protect the building was the

3    "predominating" or "most important" cause of Reno's loss (or the cause that set the others

4    in motion), and, thus, as a matter of law, was the efficient proximate cause under *Garvey,*

5    *supra* and its progeny.

6        Philadelphia cites *Julian, supra*, 35 Cal.4th 747, to suggest that the efficient

7    proximate cause analysis has been modified. However, Philadelphia misunderstands the

8    holding in *Julian* and its application to this case. *Julian* does not allow an insurer to rely

9    on multiple "proximate causes" in denying coverage. Rather, *Julian* stands for the

10   proposition that an insurer can limit coverage under the efficient proximate cause

11   analysis if the policy language does not conflict with Cal. Ins. Code § 530. Specifically,

12   the policy language in *Julian* excluded coverage for a loss "caused directly or indirectly"

13   by earth movement "regardless of any other cause or event contributing concurrently or

14   in any sequence to the loss." *Id.* at 750. A separate weather conditions clause excluded

15   coverage for a loss caused by weather conditions that contributed in any way with earth

16   movement, including a landslide. *Id.* The court determined that the weather conditions

17   clause applied to a loss occasioned by a rain-induced landslide. Thus, coverage was

18   excluded. *Id.* at 761. There is no such limiting language in the exclusions at issue here.[2]

19   (*See* RSS ¶ 41.) Thus, the *Julian* analysis is inapplicable to this matter.

20    **E. The Faulty Workmanship Exclusion Does Not Bar Coverage for Reno's Loss**

21        Philadelphia argues that the "faulty workmanship" exclusion bars coverage for

22   Reno's loss, because the loss was caused in large part by Reno's "inadequate provision

23   and maintenance of temporary protection measures." Philadelphia contends that such

24   constitutes "faulty workmanship" and, thus, coverage is excluded. In so doing,

25   Philadelphia urges this Court to ignore controlling case law directly on point.

26

---

27   [2] While the policy excludes coverage for a loss caused by Water "regardless of any other cause or event contributing concurrently or in any sequence to the loss," the Water exclusion is inapplicable here. There is no evidence that Reno's

28   loss was caused by a "flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray" or "water which backs up from a sewer or drain."

The "faulty workmanship" exclusion precludes coverage for "[f]aulty, inadequate, or defective materials, or workmanship."  (RSS ¶ 41.)  But, the Policy specifically provides that "if 'loss' by any of the Covered Causes of Loss results, we will pay for that resulting 'loss.'"  "Loss" is defined as "accidental loss or damage."  *Id.*

In California, an insurance policy is subject to the statutory rules of contract interpretation.  *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 821 (1990).  Thus, the mutual intent of the parties at the time the contract is formed governs interpretation.  *Id.* at 822.  "Such intent is to be inferred, if possible, solely from the written provisions of the contract."  *Id.*  If there is an ambiguity, such provisions are interpreted according to the objectively reasonable expectations of the insured.  *Id.*  In the insurance context, ambiguities are generally resolved in favor of coverage.  *Id.*  Moreover, coverage clauses are interpreted broadly "so as to afford the greatest possible protection to the insured" while exclusionary clauses are interpreted narrowly against the insurer.  *State Farm Mut. Auto Ins. Co. v. Partridge*, 10 Cal.3d 94, 101-2 (1973).

The term "faulty workmanship" as used in the Policy is ambiguous at most and susceptible to two different interpretations.  *Allstate, supra*, 929 F.2d at 449; *Century, supra*, 2006 U.S. Dist. LEXIS 15766.  Such term can either be interpreted to exclude coverage for "(1) the flawed quality of a finished product, or (2) a flawed process."  *Allstate, supra*, 929 F.2d at 449.

In *Allstate*, a case analogous to this loss, a roofing contractor removed most of the roof on a building but did not put a temporary cover over the exposed premises.  Subsequently, rain caused damage to the building interior.  The court determined that the faulty workmanship exclusion should be construed in favor of the insured, so that it applied only to the flawed product and not the damages arising out of the course of the work (i.e. the flawed process).  Among other things, the court pointed to the resulting loss clause in the policy as an indication that its interpretation was correct.  Specifically, the court stated that

The flawed product interpretation . . . is bolstered by the provision in the

> "faulty workmanship" exclusion that "any ensuing loss not excluded or excepted in this policy is covered." It is easy to imagine a situation where a flawed product could cause ensuing losses. For example, a leaky roof could lead to water damage to Smith's property. Presumably water damage would be an ensuing loss covered by the policy but repairing the roof would not be covered. On the other hand, it is difficult to imagine what "ensuing losses" could flow from a flawed process, because "any loss or damage caused" by the other process would be excluded. In other words, if the broader "flawed process" interpretation is accepted as the only reasonable interpretation of the policy, the "ensuing loss" language is seemingly rendered meaningless.

*Id.* at 450. Thus, the court determined that coverage was not precluded.

The court in *Century* reached the same conclusion. During construction of a 13-auditorium complex, before the waterproofing system of the roof was complete and the roof penetrations were sealed, heavy rains fell, causing water to enter the interior of the building. The contractor did not install a temporary protective covering to prevent water intrusion. The court determined that, as in *Allstate*, the faulty workmanship exclusion was ambiguous and should be resolved in favor of coverage. *Century, supra*, 2006 U.S. Dist. LEXIS 15766 at *27-28. Specifically, the court stated that "in light of the similarities between the circumstances here and those in *Allstate*, the Court considers itself bound by *Allstate* on the question of whether the Faulty Workmanship Exclusion covers construction processes." *Id.* Thus, the court concluded as a matter of law that the faulty workmanship exclusion did not justify a denial of coverage for the loss at issue. *Id.* at *28.

Here, as the court determined in *Allstate* and in *Century*, Philadelphia alleges that Reno failed to install and/or maintain temporary protection measures during construction. As *Allstate* and *Century* establish, Reno's failure does not constitute "faulty workmanship" under the policy. For the exclusion to apply, there must be the "presence of an object to evaluate." Because Reno had not yet completed construction of either building, including the doors, windows and roof assemblies, there was no product to evaluate.

What is more, as in *Allstate*, the Policy expressly provides coverage for ensuing losses. If, as Philadelphia seemingly contends, the faulty workmanship exclusion is not

ambiguous, and is only susceptible to one reasonable interpretation (i.e. faulty process), such would render the ensuing loss provision meaningless, a result prohibited under California law. *Mirpad, LLC v. California Ins. Guarantee Assn.*, 132 Cal.App.4th 1058, 1073 (2005) ("an interpretation of a policy that creates an ambiguity where none existed by rendering words redundant or superfluous violates all rules of construction").

As the court in *Allstate* explained, if the flawed process interpretation were used, any losses flowing from the flawed process would also be excluded under the policy. Such a result is contrary to established law. Thus, just as the court held in both *Allstate* and in *Century*, the flawed product interpretation applies in this situation. As such, the faulty workmanship exclusion does not preclude coverage for Reno's losses.

Philadelphia argues that *Allstate* is inapplicable, relying on out-of-state cases involving situations inapposite to the circumstances here, including *James McHugh Constr. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 F.Supp.3d 462 (2016), a Maryland case involving damage to glass caused during the cleaning process. As the court specifically acknowledged in *James McHugh*, "Contract interpretation laws [in Maryland] differ from California." *Id.* at p. 468. And, as the *James McHugh* court aptly put it "[n]otably, courts have relied on *Allstate* where, although errors in workmanship contributed in the causation, the loss or damage resulted fortuitously from events extraneous to the construction process itself." *Id.* at 469, fn. 2. Such is the case here.

What is more, Philadelphia attempts to mislead this Court by suggesting that "no California court has adopted the 'flawed product' versus 'flawed rationale' in over two decades since *Allstate*, and that the subsequent federal decisions citing to *Allstate* have criticized its application." (Motion, p. 21, ¶¶ 22-25.) To the contrary, *Allstate* has been followed at least four times by the Central District of California, as recent as 2011, including *Century, supra*, 2006 U.S. Dist. LEXIS 15766. *Berman v. Amex Assur. Co.*, 2011 U.S. Dist. LEXIS 23716 (C.D. Cal. Feb. 22, 2011); *Berman v. Amex Assur. Co.*, 2008 U.S. Dist. LEXIS 127228 (C.D. Cal. Nov. 14, 2008); and *Schaber v. Allstate Ins. Co.*, 2007 U.S. Dist. LEXIS 92942 (C.D. Cal. Dec. 18, 2007). Specifically, in *Berman,*

1  *supra*, 2008 U.S. Dist. LEXIS 127228, the court stated

> 2  For example, in *Allstate*, the court interpreted faulty workmanship to refer to
> 3  a faulty product and not a process in part to give meaning to the ensuing loss
>    provision that followed the exclusion.  The court indicated that it could only
>    imagine ensuing losses flowing from faulty finished products but not from
> 4  faulty processes.  The Policy in the instant case also includes coverage for
>    ensuing losses that result from faulty workmanship, thus supporting an
> 5  argument that workmanship only refers to a completed product.

6  *Id.* at *15.   In addition, at least two other courts have followed *Allstate*, including

7  *Pettinaro Constr. Co. v. Utica Mut. Ins. Co.*, 2001 U.S. Dist. LEXIS 9044 (D. Del. March

8  30, 2001) and *M.A. Mortenso Co. v. Indem. Ins. Co. of N. Am.*, 1999 U.S. Dist. LEXIS

9  22641 (D. Minn. Dec. 23, 1999).

10  While Philadelphia argues that *Allstate* involves an all risk policy, rather than a

11  Builder's Risk policy, the distinction is insignificant.  Builder's Risk policies, including

12  the one at issue here, are usually written on an all risk basis.  What is more, Philadelphia

13  conveniently ignores *Century, supra*, 2006 U.S. Dist. LEXIS 15766, a case involving a

14  Builder's Risk policy (with circumstances similar to those here).  The *Century* court

15  relied on *Allstate* in rendering its decision that the "faulty workmanship" exclusion was

16  ambiguous.  And, Philadelphia tries to make much of the "collapse provision" in the

17  *Allstate* policy and the absence of a similar provision here; however, the policy in

18  *Century* did not have a collapse provision either.  Rather, the *Century* court noted the

19  ensuing loss provision indicates that the flawed product interpretation in *Allstate* was

20  correct.  2006 U.S. Dist. LEXIS 15766 at *25.

21  Finally, Philadelphia argues that even if the faulty workmanship exclusion applies

22  to the finished product, coverage is still not available because the visqueen used by Reno

23  to cover the open windows/doors and incomplete roof assemblies was itself a product.

24  The visqueen, Philadelphia contends, was defective in that it failed to adequately protect

25  the building from rain.  Such an argument is absurd.  There is no evidence that the

26  visqueen, used as a temporary cover to protect the building from inclement weather

27  during construction, was defective.  Instead, the evidence demonstrates that the visqueen

28  was not adequately installed and was damaged by the wind.  (*See* RSS ¶¶ 135, 136.)  As

COUNTER-CLAIMANTS' P&As ISO THEIR OPPOSITION TO PHILADELPHIA'S MSJ

the MKA report details, the primary cause of water intrusion through the roof and the incomplete windows and doors was the "inadequate provision and maintenance of" the visqueen, not that the visqueen itself was defective.  (*See* RSS ¶ 140.)

### 1. Coverage is Available for Damages Resulting from Inadequate Drainage in the Parking Structure for Building A

Philadelphia asserts that the "water flow into the structure from Garage A" is excluded from coverage because either (a) the "error, omission, or deficiency in design or specification" exclusion; or (b) the "faulty workmanship" exclusion.  Philadelphia is wrong on both counts.

MKA alleged that the "[i]mproper design of the garage structure drainage system and the omission of a trench drain on the sloped driving deck" was the primary cause of water intrusion into the fifth-floor entry vestibule.  (RSS ¶ 24.)  This contention is disputed by Reno's expert, who opined that the cause of water intrusion into the fifth-floor entry vestibule was Reno's failure to adequately protect the area.  (RSS ¶¶ 159, 161-163.)  Specifically, Reno failed to properly slope the concrete to the drains and, knowing that the trench drain had not been installed, Reno failed to manage and control the additional anticipated water flow.  *Id.*  It is for the jury to decide which expert is correct.

Additionally, the design errors claimed by MKA cannot possibly be the efficient proximate cause of water entering Building A through the fifth-floor entry vestibule.  The reason is simple.  Reno knew about the issues with the drainage system in the garage prior to the December 2014 storm and tried to protect the area from the extra water that was expected as a result of these conditions.  (RSS ¶¶ 160-162.) Reno knew that additional sandbagging and water management efforts were necessary to control and/or divert the flow of water from the garage roof, down the ramp and toward the lower floors prior to the loss.  (*See* RSS ¶¶ 160, 161.)  And, in fact, Reno did install sandbags in the parking garage before the storm in an effort to prevent flooding.  (RSS ¶ 162.)  Just as the temporary protective measures that Reno installed over the open windows/doors and

1  incomplete roof assemblies allegedly failed, so too did its efforts to divert water around

2  the entry vestibule.  Thus, even if there were design errors (which is a factual dispute

3  between the parties' experts), those "errors" could not be the proximate cause of the loss.

4  Rather, the efficient proximate cause was Reno's failure to adequately divert the extra

5  expected water around the entry vestibule.

6          Aside from the above, there is no evidence that the absence of the trench drain

7  contributed to the loss.  In fact, the evidence demonstrates that even if the trench drain

8  was installed as originally planned, the water would have bypassed the drain and

9  continued flowing into the entry vestibule.  (RSS ¶ 159.)  What is more, there is no

10  evidence that the garage deck was improperly designed, as Philadelphia asserts.  The

11  absence of slope specifications on the design documents hardly qualifies as evidence that

12  the deck was improperly designed.  (RSS ¶ 163.)  Concrete contractors are aware that

13  concrete should be placed to flow to area drains whether or not flow lines are shown on

14  the plans.  *Id.*  In addition, contractors are obligated to request clarification if the plans

15  are insufficient.  *Id.*  Sloping concrete to drains is part of the contractor's standard of

16  care.  *Id.*  At best, Reno's alleged failure to properly slope the garage deck was the result

17  of a performance deficiency, not a design deficiency.

18          For arguments sake, even if design errors caused water to intrude into the entry

19  vestibule in Building A, those errors did not cause all of the damages sustained.  MKA

20  admitted this in its Building A report.  (*See* RSS ¶ 165.)  Thus, the design exclusion, even

21  if applicable in part, did not justify Philadelphia's refusal to pay for any portion of Reno's

22  loss.  What is more, if the damages cannot be allocated between covered and noncovered

23  causes (i.e. the damages are indivisible), the insurer is liable for the entire loss.  *State of

24  Calif. v. Allstate Ins. Co.*, 45 Cal.4th 1008, 1036-37 (2009).  The insurer has the burden

25  of proving that the damages are divisible.  *Id.*  Here it is nearly impossible to determine

26  what portion of the damage was caused by water that entered through the garage versus

27  the doors, windows and roof assemblies.  For instance, water penetrated the entry

28  vestibule in the southwest corner of Building A, allowing water to enter the Building and

spread laterally down the hallways and into the individual apartments.  (RSS ¶ 164.)  In addition, water flowed down the open movement joints into remaining floors.  *Id.*  Water also penetrated Building A through the incomplete roof assemblies, in addition to open windows and doors, causing damage to the interior units and hallways.  *Id.*  Finally, water was able to enter the apartment units due to blocked drains on the private decks.  *Id.*  There is no way to determine whether any particular damage came from water entering through the garage or the windows, doors or roofs.  *Id.*  Thus, even if the design exclusion is applicable to the water that entered through the garage, because those damages cannot be separately identified, Philadelphia is still liable for the entire loss.

In the alternate, Philadelphia argues that, if the damages were the result of improper construction techniques, coverage is barred under the "faulty workmanship" exclusion.  However, for the reasons discussed in Section III.E., such argument fails.  The garage was not fully constructed at the time of the loss.  Among other things, area drains were still being installed.  (RSS ¶ 170.)  Thus, the faulty workmanship exclusion does not preclude coverage for those losses sustained as a result of Reno's failure to sufficiently manage the water flow in the garage.

## F.  Philadelphia's Reliance on the Rain Exclusion Is Misplaced

Philadelphia also relies on the "rain exclusion," arguing that rain is one of the "proximate causes" of Reno's loss.  As discussed in detail in Section D, the efficient proximate cause of the loss is the predominate or most important cause.  *E.g. Julian, supra*, 35 Cal.4th at 753.  Philadelphia cannot rely on more than one proximate cause to justify its denial of Reno's claim.  *See e.g., id.*  As already admitted by Philadelphia, Reno's alleged failure to adequately protect the building was the most important cause of Reno's loss.  Given that admission, Philadelphia cannot rely on the "rain exclusion" to defeat coverage, regardless of whether the rain was the immediate cause of the loss.  *Garvey, supra*, 48 Cal.3d at 403.  This is especially true since Philadelphia expressly adopted MKA's conclusion that the December weather event did not cause the loss. (RSS ¶ 158.)  Specifically, MKA stated that "[w]e did not observe any indication that the

1   conditions causing the water to intrude into Building A was caused and/or damaged by

2   the weather events that occurred on December 2nd, 3rd and 4th of 2014."  (RSS ¶ 157.)

3   A similar finding was made with regard to Building B.  (RSS ¶ 140.)

4        Even if the above were not true, and the efficient proximate cause was something

5   other than Reno's alleged failure to adequately protect the building, there is evidence to

6   show that the protective measures installed by Reno were blown off by the natural force

7   of the wind.  (RSS ¶¶ 135, 136.)  In such event, wind damage would be the efficient

8   proximate cause of Reno's loss and the rain exclusion would still not apply.

9        Alternatively, even if the rain exclusion applied, Reno's losses would still be

10  covered under the ensuing loss provision.  The policy specifically covers losses caused

11  by or resulting from rain if the building first sustains damage from a covered cause of

12  loss through which rain enters.  (RSS ¶ 41.)  An ensuing loss provision operates to restore

13  coverage for losses that flow from an earlier excluded loss but are caused by a covered

14  peril.  The exception applies where the original peril triggers a subsequent peril that

15  causes a loss separate and independent from the original peril.  Unless the subsequent

16  peril is also excluded under the policy, there is coverage for the ensuing loss.  *Acme*

17  *Galvanizing Co., Inc. v. Fireman's Fund Ins. Co.*, 221 Cal.App.3d 1070, 179-80 (1990).

18       Prior to the loss, Reno installed protective visqueen, including over open doors

19  and windows and certain open sections of the roof.  (*See* RSS ¶ 135, 136.)  The December

20  weather event was accompanied by high winds, which either damaged or blew off

21  entirely, the protective measures installed by Reno.  *Id.*  Reno's installation of such

22  measures was recognized by MKA.  (In its report, MKA makes reference to damage to

23  "temporary protection of installed windows and exterior doors and incomplete window

24  and door penetrations in the exterior walls . . ."  (RSS ¶165.))  In addition, there was

25  similar wind damage to Building B.  (RSS ¶ 39.)  Reno's expert testified to photographs

26  of wind damage to the visqueen and to Building B.  (RSS ¶¶ 39, 136.)  As a result of

27  damage to the "temporary protection" installed by Reno, water was able to enter the

28  buildings.  *Id.*  Thus, by the policy terms itself, any damage caused by rain that entered

1  the buildings as a result of the wind is covered as an ensuing loss.

2    In arguing that the ensuing loss provision does not afford coverage for Reno's loss,

3  Philadelphia cites to *Diep v. California Fair Plan Ass'n.*, 15 Cal.App.4th 1205 (1993).

4  In *Diep*, the court held that the definition of the term "roof" did not include plastic

5  sheeting used to cover a portion of the roof that was removed by a contractor.  The court

6  determined that the breach in the roof was not caused by wind or hail, but by the workmen

7  who removed the portion of the roof needing repair.  Notably, *Diep* and the cases it relied

8  upon all involved situations where the existing roof had been removed or otherwise

9  deconstructed by workers, as opposed to the construction of a new structure where a roof

10 had yet to be installed and/or completed, such as here.  As the court in *Diep* recognized,

11 the expectations of the parties are different when the policy is intended to cover ongoing

12 construction as opposed to an existing structure that is already fully enclosed.   15

13 Cal.App.4th at 1210.  Thus, *Diep* is inapplicable to this situation.

14    **G. Philadelphia is Liable for Bad Faith**

15      1.  <u>Philadelphia's Denial of Reno's Claim Was Not Reasonable</u>

16    Philadelphia argues that it cannot be held liable for bad faith because its denial of

17 Reno's claim was allegedly reasonable, citing to the "genuine dispute" doctrine.  That

18 doctrine "holds that an insurer does not act in bad faith when it mistakenly withholds

19 policy benefits, if the mistake is reasonable or is based on a legitimate dispute as to the

20 insurer's liability." *Century Sur. Co. v. Polisso*, 139 Cal.App.4th 922, 949 (2006).  If the

21 coverage decision turns on a legal issue, such as policy interpretation, and the law is

22 unsettled regarding that issue, the insurer can apply any reasonable interpretation that

23 most favors its own interests. *Morris v. Paul Revere Life Ins. Co.*, 109 Cal.App.4th 966,

24 974 (2003).  However, the insurer cannot apply an interpretation that is arbitrary or

25 unreasonable. *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir.

26 2001) (applying California law).  What is more, in asserting its position, the insurer must

27 take a reasonable position under the rules of contract interpretation, which rules generally

28 favor policyholders.  Thus, if there is an ambiguity in a policy provision, the insurer must

1   interpret the ambiguity in favor of the policyholder.  *Griffen Dewatering Corp. v.*
2   *Northern Ins. Co. of N.Y.*, 176 Cal.App.4th 172, 208 (2009).  The reasonableness of the
3   insurer's decision must be evaluated at the time it was made.  *Filippo Indus., Inc. v. Sun*
4   *Ins. Co.*, 74 Cal.App.4th 1429, 1441 (1999).

5        The efficient proximate cause doctrine is codified in case law.  *E.g. Julian, supra*,
6   35 Cal.4th at 753.  It is well established that where there is a concurrence of different
7   causes, a proximate cause analysis establishes the predominant or most important cause.
8   *Id.*  Subsequent to the loss, Philadelphia determined through MKA that the efficient
9   proximate cause of the loss was largely due to Reno's "inadequate provision and
10  maintenance of temporary protection measures."  (*See* RSS ¶¶ 140, 142.)
11  Notwithstanding the same, Philadelphia argues in this brief that there can be multiple
12  "proximate causes" and/or that there are multiple "proximate causes" for this loss.
13  Philadelphia's argument is neither logical nor is it reasonable.  Neither is the efficient
14  proximate cause analysis an area of unsettled law.  Philadelphia's assertion that the rain
15  itself is a proximate cause of Reno's loss (a position Philadelphia's own expert does not
16  even take) is nothing more than an attempt to escape liability.

17       After Philadelphia denied coverage based on the "faulty workmanship" exclusion,
18  Reno demanded that Philadelphia reopen its investigation based on the court's decision
19  in *Allstate, supra*.  (RSS ¶ 143.)  Philadelphia refused, because "the *Allstate* decision is
20  a Ninth Circuit decision which is not binding in California."  (RSS ¶ 144.)  Philadelphia
21  did not point to any alternate authorities that had better reasoned analyses of the "faulty
22  workmanship" exclusion.  *See id.*  Rather, Philadelphia cited to out-of-state cases that
23  allegedly criticized the decision in *Allstate*.  *Id.*  Having removed this case to federal
24  court, it is ironic that Philadelphia would argue that a Ninth Circuit decision (applying
25  California law) was not controlling.  In addition, there is nothing in the claim file,
26  produced during discovery in this litigation, that indicates that the claims adjusters
27  considered *Allstate* or any other authorities when deciding to deny coverage.

28       Moreover, when refusing to reopen its investigation, Philadelphia did not cite the

1   *Landmark* decision or any of the other myriad out-of-state cases cited in its Motion. (*See*

2   RSS ¶ 144.) This shows that Philadelphia began relying on these foreign cases only after

3   the denial and then only to justify its coverage decision. There is no evidence that

4   Philadelphia looked at any of these cases at the time of its denial. It is also telling that

5   Philadelphia cites a Maryland case that specifically notes the contract interpretations laws

6   in Maryland differ from California. *James McHugh, supra*, 223 F.Supp.3d at 468.

7   Philadelphia is not just relying on the faulty workmanship exclusion; it has also argued

8   that there are multiple efficient proximate causes and that the design exclusion and water

9   exclusions apply. Philadelphia cannot defeat a bad faith action by alleging a genuine

10  dispute as to only one issue, like faulty workmanship. *Bernstein v. Travelers Ins. Co.*,

11  447 F.Supp.2d 1100, 1111 (N.D. Cal. 2006) (applying California law).

12      To escape bad faith based on the genuine dispute doctrine, Philadelphia's belief at

13  the time it denied coverage must have been reasonable. However, Philadelphia's actions

14  demonstrate anything but reasonable behavior. In fact, Philadelphia's reliance on the

15  genuine dispute doctrine to justify its denial in this Motion bespeaks of bad faith.

16          2. <u>Philadelphia's Bad Faith Conduct</u>

17      Philadelphia's behavior has been rife with bad faith conduct, starting from the time

18  it denied coverage for Reno's loss. An insurer's reasonableness may be affected by the

19  insurer's willingness (or refusal) to reconsider its earlier denial. *Austero v. National Cas.*

20  *Co. of Detroit, Mich.*, 84 Cal.App.3d 1, 35 (1978). "An insurer's early closure of an

21  investigation and unwillingness to reconsider a denial when presented with evidence of

22  factual errors will fortify a finding of bad faith." *Shade Foods, Inc. v. Innovative*

23  *Products Sales & Marketing, Inc.*, 78 Cal.App.4th 847, 880 (2000). Proof that an insurer

24  ignored evidence in the file that supported the claim, while focusing on facts justifying a

25  denial, and that it failed to utilize objective standards in making its claims decisions are

26  important factors in establishing bad faith. *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th

27  713, 721 (2007); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1281 (1994)

28  (searching for ways to avoid paying claims breaches insurer's duty to investigate fairly).

From the start, Reno contested Philadelphia's denial of coverage, pointing to factual errors and providing reasoned analysis. (RSS ¶¶ 141-144, 146.) Notwithstanding, Philadelphia dug in its heels and refused to reopen its investigation or reconsider its denial. *Id.* Rather, Philadelphia continued to point to additional exclusions and/or irrelevant or inapplicable case law. For example, in its initial denial, Philadelphia relied on the "rain exclusion." (*See* RSS ¶ 141.) In so doing, Philadelphia ignored MKA's findings, namely that weather was not the cause of the loss. When so confronted, Philadelphia then claimed that the protective measures were inadequate and, thus, coverage was excluded under the "faulty workmanship" exclusion. (RSS ¶ 142.) After Reno provided case law showing that the "faulty workmanship" exclusion did not apply, Philadelphia dismissed it as "not controlling" and relied on a couple of out-of-state decisions to justify its prior coverage denial. (RSS ¶ 144.)

Philadelphia's bad faith conduct did not end there. Philadelphia filed the instant action against Reno, among others, for reimbursement of sums paid to QFW for the prior fire loss. (RSS ¶ 147.) Reno demanded that Philadelphia immediately dismiss its complaint as it improperly sought subrogation from its own insured. (RSS ¶ 148.) *St. Paul Fire & Marine, supra*, 65 Cal.App.3d at 75. Philadelphia ignored Reno's demands. (RSS ¶ 149.) As a result, Reno was forced to respond to the lawsuit. *Id.* Philadelphia finally dismissed the suit more than two months later, leaving only Reno's cross-complaint against Philadelphia. (RSS ¶ 150.)

After Philadelphia denied Reno's claim, it requested that Reno arrange for Philadelphia to conduct an EUO of Marco Sessa and Matt Adams, both with QFW. (RSS ¶ 152.) Despite repeated requests that Philadelphia provide legal authority supporting its request, Philadelphia provided none. (*See* RSS ¶ 153.) Rather, Philadelphia scheduled the EUOs on its own and provided Reno with less than 24 hours' notice of them. (RSS ¶ 154.) Such was done notwithstanding Reno's objections based on, among other things, the pending federal litigation. (And notwithstanding the fact that the Rule 26(f) conference had not yet taken place.) Philadelphia refused to cancel the EUOs even after

1  Reno provided legal authority confirming that Philadelphia waived its right to conduct
2  EUOs when it denied coverage.  (RSS ¶ 155.)  14 *Couch on Insurance* 2d § 49A:363
3  (1982).  Philadelphia moved forward with the EUOs claiming they were necessary to
4  further Philadelphia's "investigation" of Reno's claim—a claim that was denied in
5  September 2015.  (RSS ¶ 156.)

6       Philadelphia's bad faith conduct has continued to this day, notwithstanding its
7  obligation to act in good faith toward its insured after suit is filed.  *White v. Western Title*
8  *Ins. Co.*, 40 Cal.3d 870, 886 (1995).  Among other things, Philadelphia's designated
9  Person Most Knowledgeable adamantly refused to acknowledge that the policy is an all
10  risk policy because the policy does not contain the term "all risk."  (RSS ¶ 132.)  In
11  addition, Philadelphia asserted claims of insurance fraud against Reno, claiming that
12  Reno was paid for a portion of its loss by QFW.  (*See* RSS ¶¶ 165-169.)  Notwithstanding
13  testimony from QFW refuting this, Philadelphia continued to question Reno's witnesses
14  as to whether or not Reno was paid for a portion of the loss.  *Id.*  What is more,
15  Philadelphia propounded written discovery ¶on Reno regarding such claims and did not
16  withdraw said discovery in light of deposition testimony disproving such claims.  *Id.*
17  Philadelphia's actions demonstrate a pattern of bad faith behavior throughout the course
18  of this litigation.

19  ### H. Punitive Damages

20       To support an award of punitive damages, there must be "clear and convincing
21  evidence" of "oppression, fraud or malice" within the meaning of Cal. Civ. Code §
22  3294(a).  *Silberg v. Calif. Life Ins. Co.*, 11 Cal.3d 452, 462 (1974).  The same evidence
23  that proves the insurer's bad faith may be relevant to the issue of punitive damages.  *See*
24  *Shade Foods, supra*, 78 Cal.App.4th at 909.  "A careless disregard for the rights of an
25  insured and an obstinate persistence in an ill-advised position" on the part of an insurer
26  may amount to oppression under Cal. Civ. Code § 3294.  *Id.* at 892.  As discussed in
27  detail above, Philadelphia refused to consider additional evidence and relevant case law
28  regarding its denial of Reno's claim.  (RSS ¶¶ 141-144.)  Rather, Philadelphia has relied

on out-of-state cases and erroneous interpretations of the policy to support its denial of Reno's claim. (RSS ¶ 144.) In addition, Philadelphia improperly sought subrogation from its own insured for losses paid out on an unrelated claim and refused to dismiss the lawsuit. (RSS ¶¶ 147-150.) What is more, Philadelphia sought Reno's assistance in scheduling EUOs after Philadelphia denied Reno's claim under the guise of a continued investigation when Philadelphia never withdrew its denial of coverage or reopened its investigation. (RSS ¶¶ 152-156.) In addition, Philadelphia scheduled EUOs notwithstanding this litigation and provided Reno with less than 24 hours' notice of said EUOs. *Id.* Then, Philadelphia attempted to use the EUOs during this litigation. Finally, Philadelphia asserted claims of insurance fraud against its own insured notwithstanding testimony refuting such claims. (RSS ¶¶ 166-169.) In short, Philadelphia has engaged in a careless disregard for the rights of its insured and an obstinate persistence in an ill-advised position. Thus, Philadelphia is liable for punitive damages. While Philadelphia claims that punitive damages cannot be assessed against a corporation without a knowing ratification of oppression, fraud or malice by an officer, director or managing agent, such is only the case if punitive damages liability is sought for the acts of an agent or an employee. Cal. Civ. Code § 3294(b). Such is not the case here. However, even if it were, the claims adjuster, John Gartling, was being supervised by the Vice President of Claims, John Kirby, who approved Mr. Gartling's denial of Reno's claim. (RSS ¶ 145.)

## V.   CONCLUSION

For the foregoing reasons, Reno respectfully requests that this Court deny Philadelphia's Motion in its entirety.

Dated:  April 10, 2018

McLEOD LAW GROUP, A.P.C.
By:   /s/ Kristina A. Fretwell
JOHN J. MCLEOD
KRISTINA A. FRETWELL

Attorneys for Counter-Claimants
Email:jmcleod@mcleodlawgroup.com
Email:kfretwell@mcleodlawgroup.com

COUNTER-CLAIMANTS' P&As ISO THEIR OPPOSITION TO PHILADELPHIA'S MSJ

**CERTIFICATE OF SERVICE**
*Philadelphia Indemnity Insurance Company v. T.L. Fab, LP, et al.*
United States District Court for the Southern District of California
Case No.: 17-cv-00306 W (MDD)

STATE OF CALIFORNIA     )
                           ) ss:
COUNTY OF SAN DIEGO    )

     I am employed in the County of San Diego, State of California.  I am over the age of eighteen years and not a party to the action.  My business address is 701 B Street, Suite 1570, San Diego, California 92101.  On April 10, 2018, I caused to be served a true and correct copy of the following document(s) described as:

1. **COUNTER-CLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR OPPOSITION TO PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT;**

2. **COUNTER-CLAIMANTS' RESPONSIVE SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR OPPOSITION TO PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT;**

3. **DECLARATION OF PETER HUNTER IN SUPPORT OF COUNTER-CLAIMANTS' OPPOSITION TO PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT;**

4. **DECLARATION OF DAVID A. BALL IN SUPPORT OF COUNTER-CLAIMANTS' OPPOSITION TO PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT;**

5. **DECLARATION OF KRISTINA A. FRETWELL IN SUPPORT OF COUNTER-CLAIMANTS' OPPOSITION TO PHILADELPHIA INDEMNITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT.**

Addressed to the following recipients:

| | |
|---|---|
| Larry M. Arnold, P.C.<br>Margaret R. Miglietta, Esq.<br>Noura Kawar, Esq.<br>CUMMINS & WHITE, LLP<br>2424 S.E. Bristol Street, Suite 300 | Counsel of record for Cross Defendant,<br>**PHILADELPHIA INDEMNITY INSURANCE COMPANY** |

-1-
PROOF OF SERVICE

| | |
|---|---|
| Newport Beach, California 92660-0764<br>Tel.: (949) 852-1800<br>Fax: (949) 852-8510<br>Email: larnold@cwlawyers.com<br>Email: mmiglietta@cwlawyers.com<br>Email: nkawar@cwlawyers.com | |

☒   **BY ELECTRONIC FILING AND SERVICE**:  By electronic filing and service of the foregoing document(s) using the CM/ECF System: in accordance with F.R.C.P. 5(b)(2)(E) and Local Rule 5.4, I electronically filed the above-listed documents by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

☒   [Federal]     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 10, 2018 at San Diego, California.

/s/ Christopher T. Hicks
Christopher T. Hicks